Filed 5/26/26  P. v. Smith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN DAVID SMITH,<br><br>　　Defendant and Appellant. | H052539<br>(Santa Cruz County<br>Super. Ct. No. 22CR00438) |

In 2022, appellant Jonathan David Smith was charged with robbery (Pen. Code, § 211[1]) and assault with a deadly weapon (§ 245, subd. (a)(1)), on victim T.B.[2], and two counts related to him resisting police officers, including an enhancement for the infliction of great bodily injury on one of the arresting deputies (§ 12022.7, subd. (a)).  After the trial court denied his motion for mental health diversion (§ 1001.36) on the basis that he presented an unreasonable risk of danger to public safety if released into the community for treatment, Smith pleaded no contest to one count of grand theft (§ 487, subd. (a)(1)) and one count of resisting an executive officer (§ 69), as well as the great bodily injury enhancement ((§ 12022.7, subd. (a)), and was placed on formal probation, with execution of his five-year prison sentence suspended.

---

[1] Unspecified statutory references are to the Penal Code.

[2] We refer to the victim in the proceedings by his initials only to protect his personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(4) and (b)(10).

On appeal, Smith contends that the trial court abused its discretion in denying his motion for mental health diversion because substantial evidence does not support the trial court's finding that he posed an unreasonable risk of danger to public safety, as defined under section 1001.36. For the reasons stated below, we conditionally reverse the judgment and remand with directions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Factual Background and Charges*

Deputy Paul Meier of the Santa Cruz County Sheriff's Department reported that on January 28, 2022, he was dispatched to investigate a skateboard robbery in the Aptos area. Meier spoke to victim T.B., who indicated that he had been standing on a street corner in Aptos when Smith approached him and tried to engage in conversation, then grabbed T.B.'s skateboard out of his hands. When T.B. attempted to take his skateboard back, Smith began swinging it back and forth in what appeared to be a taunting gesture, and at one point, T.B. was forced to duck in order to avoid being hit. After Smith threw the skateboard at a nearby wall and walked away, T.B. was able to retrieve his skateboard.

T.B. then went into a nearby restaurant. As T.B. was eating on the back patio, Smith entered the restaurant and began yelling at random employees and people inside. Smith then approached T.B., grabbed his skateboard again, and walked out of the restaurant. T.B. attempted to pursue Smith for about 30 feet, at which point Smith took a rock out of his pocket and threw it at T.B. The rock, which was approximately six inches in size, struck T.B. in the rib cage and resulted in a two-inch laceration on the right side of T.B.'s ribs. T.B. then called 911 to report the two incidents, and continued to follow Smith until he lost sight of him behind a trestle of bushes.

Later on the same day, Meier and Deputy Nathan Engelhardt, along with other deputies from the Santa Cruz County Sheriff's Department, arrived at Smith's house to arrest him after receiving various reports of him acting erratically and being involved in

disturbances in the Aptos area.  Engelhardt testified that Smith refused to come out of the house when requested to do so, then attempted to shut the door.  Englehart and other deputies, including Deputy Damon Hancock, then entered the residence and arrested Smith, but Smith refused to move, forcing them to have to extract him from the bathroom.  As they moved towards the front door, Smith planted his feet out in front in order to stop moving forward, then kicked his feet up and planted his feet on the frame of the front door to prevent the deputies from bringing him out the door.  During this time, Meier observed Hancock, who was involved in removing Smith from the residence, pull away and favor his left arm as though he had been injured.  Meier later learned from Hancock that he had torn a bicep tendon in his left arm, and after undergoing surgery, it was unclear whether he would be able to return to work as a patrol deputy.

## B.    *Procedural History*

### 1.  *Charges and Initial Release*

Following the preliminary hearing, on February 22, 2022, the Santa Cruz County District Attorney's Office filed an information charging Smith with second degree robbery (§ 211; count 1); assault with a deadly weapon (§ 245, subd. (a)(1); count 2); resisting a peace officer and causing great bodily injury (§ 148.10, subd. (a); count 3); and resisting an executive officer (§ 69; count 4).  The information also alleged that in the commission of count 4, Smith personally inflicted great bodily injury on Hancock (§ 12022.7, subd. (a)).

On February 23, 2022, Smith's trial counsel requested that Smith be released from custody due to him suffering from a medical condition requiring treatment.[3]  Over the People's objection, the trial court granted the request and released Smith to his family on his own recognizance with intensive supervision and a GPS monitor.  The trial court

---

[3] During the preliminary hearing, Smith's counsel indicated that prior to the offense and arrest, Smith had fallen from his bicycle and had a bad accident on the road, leading to a head injury.

3

further ordered that Smith only leave his residence for purposes of medical treatment and appointments.

### 2. Mental Health Diversion Proceedings

#### a. Psychological Evaluation Report

Clinical psychologist Dr. Carolyn Murphy conducted a psychological evaluation of Smith on May 9, 2022. After reviewing police reports of the January 28, 2022 incident, as well as Smith's criminal record and medical history, Dr. Murphy noted that Smith had previously been diagnosed with major depressive disorder (MDD), ADHD, alcohol use disorder, cannabis use disorder, and stimulant use disorder. Dr. Murphy indicated that Smith had been prescribed antidepressants to treat his MDD, but Smith did not appear to appreciate how fully the medication worked as he was inconsistent with taking it regularly and would attempt to stretch time between refills by taking less medication than prescribed. Dr. Murphy noted that over the years since Smith's diagnosis, there had been several calls for services related to his mental health crises due to reoccurring episodes of him becoming acutely depressed or erratic. Dr. Murphy also noted that six months prior to the offense, Smith had completely stopped using his antidepressants, and had resumed heavy drinking. Dr. Murphy further indicated that Smith "started drinking young, and was using cannabis starting at age thirteen or fourteen. Cocaine, methamphetamine, LSD, mushrooms, and ecstasy have also been used. [Smith] noted that the last time he drank was the day of the offense, and that cannabis was last used either late December to early January, and that methamphetamine had been used in January, but only once or twice (however, he does report having used methamphetamine extensively in his life, and that he will use in runs, with periods of use followed by periods of sobriety, with one episode leading to an ER admission)."

With regard to the January 28, 2022 incident, Dr. Murphy stated that Smith's substance abuse issues "appear to have disinhibited and disorganized him significantly on the date in question (he was described as intoxicated by his girlfriend earlier in the day,

4

and he was walking around without a shirt on at the time of the offense and was behaving erratically, which would also be consistent with substance use). While his primary diagnosis is that of Major Depressive Disorder … and depression can lead to periods of agitation as well as mood lability, his offense conduct in this case appears to be related to substance use (with the mood disturbance being the cause of said substance use, however)." Dr. Murphy further noted that according to Smith, he "appears to have believed the victim posed him some sort of danger, when none was present, and he was most likely distorting reality at the time of the offense."

Dr. Murphy observed that while Smith was susceptible to anxiety and stress, he had expressed a desire for change, including a willingness to undergo treatment and distress at his ongoing symptoms, and also had a supportive family in the community. Dr. Murphy concluded that Smith appeared to be in the moderate risk range for violence, "with more of an emphasis being on the relative lack of violence or aggression in his history until this offense and the fact that with intensive mental health and substance abuse treatment, along with medication compliance and ongoing sobriety, his risk of harm can be managed." However, Dr. Murphy cautioned that Smith had a history of noncompliance with interventions, suggesting that a more structured regimen of care was necessary requiring "a stable living situation, structured substance abuse and mental health care, and compliance checks."

### b. *Mental Health Diversion Application and Opposition*

On August 24, 2022, Smith filed a request for mental health diversion pursuant to section 1001.36, which included the psychological evaluation by Dr. Murphy. Smith argued that based on Dr. Murphy's evaluation, he met the requirements for mental health diversion as follows: (1) he had been diagnosed with qualifying conditions, namely MDD, ADHD, and alcohol and substance use disorder, (2) his mental health order played a significant role in the commission of the charged offense, based on him no longer using antidepressants, heavy drinking, and erratic behavior on the day of the offense; (3) his

5

mental health symptoms motivating his criminal behavior would respond to treatment; and (4) he did not pose an unreasonable risk of danger to public safety. With respect to the last requirement, Smith noted that he was in compliance with his mental health plan and all requirements of his intensive supervised release, and had been clean and sober since February 2022; he further cited Dr. Murphy's conclusion that he was only of moderate risk if placed under mental health diversion treatment in the community, provided he remained compliant with medication and remained sober.

In opposition, the People argued that Smith had repeatedly failed in outpatient treatment, and currently had five separate open cases involving him threatening or assaulting civilians and police officers. The People noted that Dr. Murphy's report indicated that Smith's behavior at the time of the offense appeared to be related to his substance abuse disorders, not his MDD, and that the report acknowledged Smith's "long history" of unsuccessful treatment, including his lack of compliance with his antidepressant treatment regimen. The People also indicated that Smith's offenses appeared to be random attacks on members of the public, including throwing rocks and weapon at passing cars, attacking a homeless man, and confronting random citizens in an aggressive manner, which were then followed by repeated failures to comply with lawful requests of police officers. The People therefore contended that Smith was "too great a danger" to be released to outpatient treatment, and the court should "not grant [him] yet another chance to injure someone."

On March 6, 2023, Smith filed a supplemental request to his initial application based on recent amendments to section 1001.36, which modified the eligibility criteria for mental health diversion. Smith noted that a defendant was now eligible for diversion if he or she had received a diagnosis or treatment for a qualifying mental health disorder within the past five years, and that clear and convincing evidence was required to demonstrate that the defendant's mental health disorder was not a significant factor in the commission of the offense. Smith again cited Dr. Murphy's report regarding his

6

diagnosis, including her conclusion that he was only of moderate risk if released into the community provided, he remained compliant with his treatment plan. Smith also noted that he had remained clean and sober, was already engaged in treatment plans for his diagnoses, and remained compliant with the terms of his release, which had been modified from intensive supervised release to supervised released in September 2022. Smith further noted that there were no factors present reflecting any risk of him committing a "super strike" offense, thus reflecting that he did not pose an unreasonable danger to the community if released for treatment. Smith also attached an addendum from Dr. Murphy to her initial report, where she indicated that the reason for Smith's substance abuse was an underlying depressive disorder, and Smith would therefore need treatment for "dual diagnosis" in order to effectively treat his conditions. While Dr. Murphy still opined that it was Smith's substance abuse disorder that played a significant factor in the offense, she noted that his depression was present at the time and was "likely to have played some role on that date (one cannot separate out which thoughts and feelings were solely substance-induced and not in any way influenced by his underlying mood, and it is well known depression can lead to irritability and agitation)."

### c. Argument and Ruling

On May 12, 2023, the trial court held a determination hearing on Smith's mental health diversion motion. At the hearing, Smith's counsel again noted Dr. Murphy's conclusion that there was a nexus between Smith's mental health disorders and the offenses in question. Counsel further argued in the year that Smith's request had been pending, he had been fully compliant with his treatment plan and had done an "excellent job" of rehabilitating himself by taking care of himself and his mental illness. In response, the People argued that Smith had a number of incidents that were "quite violent, quite scary" to the community, and that the resulting injury to Hancock was a career-ending injury as he would not be able to return to duty. The People also cited

7

Smith's previous failures in his treatment programs, and contended that Smith was "absolutely a risk to the community and a risk for failure in treatment."

After taking the matter under submission, the trial court issued its ruling on July 2, 2023. The trial court recognized Smith's dual diagnosis and acknowledged that his depression either "drives the drinking or is in conjunction with the drinking." However, the trial court ultimately denied Smith's application for mental health diversion and stated as follows:

"But the Court still is left with the situation where public safety is a major concern. The reports indicated not only injuries, personal injuries, to two individuals, but members of the community calling the police based on behaviors down at the beach, swinging a shovel at the beach, being erratic in behaviors where, like, multiple citizens would call police, and then police would show up on a couple of these occasions—on three different occasions—and citizens are, like, do something about him, you know, what are you gonna do. And then police would show up and then he would not at all cooperate with police. I mean, he was never peaceful with the police in these occasions, unfortunately. [¶]

"And there was also, not only the swinging of the shovel, but the swinging of the construction tools, a hammer and a commercial level. On a different occasion, the injury of the skateboard. He was responsible for injuring that individual. [¶]

"Because of the lack of any cooperation with the police on any—he didn't cooperate on any of these with police. I mean, he just either ignored them, went into the surf or he would not follow their directions. It was very difficult for police to actually respond. And it was citizens of the community that called the police on these various occasions. [¶]

"Unfortunately, he also was in a situation where he was injured himself. And his girlfriend attempted to get him to medical care. And his family tried to get him to

8

medical care. And he still was not cooperative with that either. [¶]

"I do understand that he has done well in his treatment, but he has a history of not doing well after a period of time. He has been in and out of residential treatment, as noted in the documentation. He's been in rehab in Lompoc, San Diego. He's also been in outpatient services through local Encompass. He's done Pathways in San Jose. He's done Santa Cruz Residential twice. [¶]

"So the Court also has to be confident that the stability that we have seen most recently is a long sustainable plan for him. And, unfortunately, his pattern has not been one of sustainability of his mental health supports or his sobriety. [¶]

"So the Court is—and, quite frankly, I had to really sleep on this one, because I look at the work that he's been doing and I look at the supports that he has and the period of time that his attorneys have been seeking this possible diversion for him. [¶]

"But the underlying discretion of the Court is really focusing on public safety. And based on public safety concerns and the injuries—one is a long-term injury to a police officer who may not even be able to go back to their chosen employment. This is a situation that there's an unreasonable risk of danger and danger to public safety. [¶]

"So, therefore, the Court is not finding him suitable. I otherwise would have found him eligible. But it's the suitability that the Court struggles with and cannot in good conscience grant mental health diversion."

### 3. *Plea and Sentencing*

On April 24, 2024, Smith entered a plea of no contest to an amended charge of felony grand theft (§ 487, subd. (a); count 1) and resisting an executive officer (§ 69; count 4), and admitted the great bodily injury allegation as to count 4 (§ 12022.7, subd. (a)). In exchange for his plea, the trial court indicated it would sentence him to three years in prison, with execution of the sentence to be suspended, and place him on formal probation for two years, with the remaining counts to be dismissed.

On September 13, 2024, Smith appeared for sentencing. At that time, the trial

court indicated that it was amending the previous "indicated offer" of a suspended three-year prison sentence to a suspended five-year prison sentence. Smith agreed to the new court indicated and was sentenced as follows: (1) the midterm of two years prison for resisting an executive officer (§ 69; count 4), with a consecutive term of three years prison for the great bodily injury enhancement (§ 12022.7, subd. (a)); and (2) a concurrent term of eight months (one-third the midterm of two years) for felony grand theft (§ 487, subd. (a); count 1). The trial court suspended execution of the sentence and placed Smith on formal probation for two years.

Smith timely appealed the court's denial of his application for mental health diversion. The trial court granted Smith's request for a certificate of probable cause.

## II. DISCUSSION

Smith contends that the trial court abused its discretion by denying his request for mental health diversion based on its finding that he posed an unreasonable risk to public safety. Smith argues that the trial court misunderstood the legal standards required by failing to make a finding that he posed an unreasonable risk of committing a "super strike" offense if he were to be treated in the community. Further, Smith claims that the record does not support a finding that he did pose a risk because the trial court "manifestly did not believe" he posed an unreasonable risk of committing a super strike offense, as demonstrated by its immediate release of Smith into the community for treatment as part of his sentence.

### A. *Applicable Law and Standard of Review*

"In 2018, the Legislature enacted sections 1001.35 and 1001.36 to create a pretrial diversion program for defendants with certain mental health disorders. [Citation.] Pretrial diversion 'allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment.' [Citation.] The statute expressly promotes '[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system

10

while protecting public safety.' [Citations.]" (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133.)

"As presently enacted, section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a [specified] mental disorder . . . within the last five years by a qualified mental health expert. [Citation.] Second, the 'defendant's mental disorder was a significant factor in the commission of the charged offense.' [Citation.] 'If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.' [Citation.]" (*People v. Graham* (2024) 102 Cal.App.5th 787, 795 (*Graham*).) "If a defendant meets these eligibility requirements, the court also must find that the defendant is suitable for pretrial diversion based on satisfaction of the following criteria: '(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial … . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion … . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community.' [Citation.]" (*Ibid.*)

Section 1170.18 defines " 'unreasonable risk of danger to public safety' " as "an unreasonable risk that the petitioner will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv). (*Id.*, subd. (c).) That provision of section 667 sets forth eight categories of offenses that are commonly referred to as "super strikes," including "[a]ny homicide offense, including any attempted homicide offense, defined in [s]ections 187 to 191.5, inclusive." (§ 667, subd. (e)(2)(C)(iv)(IV); see also

11

*People v. Moine* (2021) 62 Cal.App.5th 440, 449 [noting that the " ' "super strikes" ' " include murder and attempted murder] (*Moine*).)

"[A] defendant is not suitable for diversion if the defendant is 'too dangerous to be treated in the community because he [or she] would commit a new violent super strike.' [Citation.] When determining whether the defendant will pose an unreasonable risk of danger to public safety, '[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate.' [Citation.]" (*Graham, supra,* 102 Cal.App.5th at pp. 798–799.) " ''Ultimately, however, diversion under section 1001.36 is discretionary, not mandatory, even if all the [statutory] requirements are met.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887; see also *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*).)

"We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion. [Citations.] 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation].' [Citation.]" (*Graham*, *supra*, 102 Cal.App.5th at p. 795.) In addition, we review a trial court's factual findings in support of its ruling for substantial evidence. (*Whitmill, supra*, 86 Cal.App.5th at p. 1147.) " 'On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that

12

determination depends.' " (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.)

**B.     Analysis**

**1.     The Trial Court's Finding that Smith Posed an Unreasonable Risk to Public Safety As Defined Under Section 1170.18 Is Not Supported by Substantial Evidence**

As a preliminary matter, the parties do not appear to be contesting that Smith met the eligibility requirements for diversion as set forth in *Graham, supra,* 102 Cal.App.5th at p. 795, or the first three suitability factors for diversion. Accordingly, the only issue we address on appeal is whether the trial court abused its discretion in denying Smith's application for mental health diversion on the basis that Smith posed an unreasonable risk of danger to public safety.

Smith argues that the trial court never made a specific finding that he posed an unreasonable risk of committing any of the super strike offenses listed under section 667, subdivision (e)(2)(C)(iv)(IV), and the People similarly never made such an argument in their opposition to his request. He contends that substantial evidence does not support such a finding, based on the following: (1) Dr. Murphy's conclusion that he only posed a moderate risk to danger to the community if released for treatment; (2) his compliance with his treatment protocol and directives from the time he was released on his own recognizance until his diversion request was heard; (3) the lack of violent offenses or felonies in his criminal history; and (4) his current offenses not being super strikes and only involving "some violence." He further argues that the trial court's actions reflected that it misunderstood the correct legal standard for assessing his risk to public safety, based on its inconsistent actions of (1) granting him release on his own recognizance pending his diversion request, and (2) denying his diversion request, then subsequently releasing him back into the community for continued treatment pending sentencing, and allowing him to continue such treatment in the community by giving him a suspended

13

sentence and probation.

In response, the Attorney General argues that substantial evidence supports an implied finding that Smith posed an unreasonable risk of committing a super strike. The Attorney General notes that the violent and serious nature of Smith's conduct was "manifest," including him swinging a skateboard in T.B.'s face and later injuring him with the rock, and seriously injuring Hancock while resisting arrest, resulting in Hancock suffering a career-ending injury. Based on these facts, and the trial court's discussion of them when making its ruling, the Attorney General contends that it was "reasonably inferable" from the record that Smith posed an unreasonable risk of danger of committing a serious or violent offense listed under section 667, subdivision (e)(2)(C)(iv)(IV).

As Smith correctly points out, the record does not reflect the parties or the trial court mentioned the standard set forth in section 1170.18 for posing an unreasonable risk to public safety, nor did any of the parties mention the super strike requirement during the hearing on Smith's petition for diversion. We therefore requested supplemental briefing from the parties as follows: "1. The record reflects that neither the prosecutor nor trial court explicitly mentioned the "super strike" standard set forth in Penal Code section 1170.18 with respect to the determination of whether appellant posed an unreasonable risk of danger to public safety. Please discuss whether the trial court's findings reflect this standard was contemplated or met in its denial of appellant's mental health diversion application. [¶] 2. Please discuss the proper interpretation of the phrase "if treated in the community" under Penal Code section 1001.36, subdivision (c)(4), as it relates to a trial court's determination of whether a defendant would pose an unreasonable risk to public safety if granted mental health diversion. Specifically, please address whether treatment in the community necessarily excludes compulsory treatment where the consequence of the failure to comply is not merely the reinstatement of proceedings for the adjudication of guilt but the service of a prison sentence. In responding to this question, please provide citations, where applicable, to the legislative history behind Penal Code section

14

1001.36 and other similar statutes."[4]

In his supplemental brief, Smith argues that there is nothing in the record to demonstrate that the trial court recognized the super strike standard or made any findings—explicit or implicit—that he posed an unreasonable risk to safety based on any likelihood of him committing a super strike offense. Smith further claims that the underlying conduct cited by the court in its findings did not come within the definition of a super strike offense under section 1170.18.

In the Attorney General's supplemental brief, the Attorney General argues that both parties cited section 1170.18 in their request and opposition to mental health diversion in the trial court, and the trial court indicated it had reviewed all pleadings prior to making its ruling. While the Attorney General acknowledges that there was no discussion of section 1170.18 during the hearing, the Attorney General contends that a silent record does not affirmatively show error, and it is presumed that the trial court knew and followed the law.

Even reviewing the trial court's findings and ruling in the most favorable light, we cannot conclude that the trial court implicitly found that Smith posed an "unreasonable risk of danger to public safety" within the meaning of section 1170.18. In order to deny diversion on this basis, "the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies." (*Moine, supra,* 62 Cal.App.5th at p. 450.) First, there was no evidence presented that Smith had committed or been charged with a super strike offense previously. While Smith's originally charged offenses of robbery, assault with a deadly weapon, resisting a peace officer, and resisting

---

[4] In their supplemental briefing, both parties agree that the phrase "if treated in the community" under Penal Code section 1001.36, subdivision (c)(4) refers specifically to mental health treatment falling within the scope of mental health diversion, not compulsory treatment ordered as a condition of probation (and therefore carrying the threat of prison or jail time for failure to comply). In light of our conclusion that conditional reversal and remand is appropriate, we do not address this question.

an executive officer involved some violence and were unprovoked, without more, this does not support an implied finding that Smith was likely to commit to a super strike offense under section 667, subdivision (e)(2)(C)(iv) in the future. (*Moine, supra,* 62 Cal.App.5th at p. 450–451.) Second, although not dispositive, we note that at the time of the hearing, Smith had been released on his own recognizance and receiving treatment in the community for over a year, and no evidence was presented that new charges had been filed against him or he had engaged in other conduct reflecting a likelihood of him committing a super strike offense. (See *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 690 (*Gomez*) [finding insufficient evidence that defendant posed an unreasonable risk to safety when, among other factors, defendant had been out in the community for a year with no new offenses or charges filed against her by the time of her hearing].) Accordingly, based on the requirement under section 1001.36, subdivision (c)(4) specifically limiting the public safety inquiry to the likelihood that a defendant would commit a super strike offense, we conclude there was insufficient evidence to support such a finding.

### 2. *The Record Does Not Support a Conclusion that the Trial Court Exercised Its Residual Discretion In Denying Diversion*

In our request for supplemental briefing, we also asked the parties to address the following question: "3. Both parties appear to agree that the trial court is vested with residual discretion to deny mental health diversion to a defendant who makes a prima facie showing that he or she meets the criteria for eligibility and suitability, so long as the denial is consistent with the principles and purpose of Penal Code section 1001.36. If this court concludes that the trial court erred in denying appellant's application for diversion on suitability grounds, would such an error be harmless on this record?"

In his supplemental briefing, Smith argues that the court's error in denying diversion on suitability grounds was not harmless simply because the court could have exercised its residual discretion instead. Smith claims that in such a situation, no court

16

could ever be found to abuse its discretion in denying diversion even if such a denial reflected a misapplication of the law. Smith further argues that because the trial court concluded he posed an unreasonable risk to public safety under an incorrect standard, it could not use its residual discretion "to create a lower standard than what is explicitly required by the statute for finding diversion would not protect public safety." In response, the Attorney General argues that the trial court appropriately exercised its residual discretion in denying diversion because the court did not rely solely on the circumstances of the charged offenses in making its ruling, but also cited Smith's history of failing residential and outpatient treatment programs.

"Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 893 (*Sarmiento*).) Further, "in the guise of exercising its 'residual' discretion, a court is not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent." (*Id.* at p. 896.) In the instant matter, we find no indication that the trial court was aware of or intended to exercise its residual discretion in denying Smith's application for diversion. In fact, the trial court noted that it "struggle[d] with" whether Smith was suitable for diversion but ultimately denied the petition in "good conscience." While the trial court briefly mentioned Smith's prior failures to complete treatment, the court indicated in its holding that its "underlying discretion … is really focusing on public safety."

Given our conclusion that there was insufficient evidence to support the trial court's finding that Smith posed an unreasonable risk to public safety, as that term is used in section 1001.36, we agree with Smith that it would be improper to now uphold the court's decision as a proper exercise of its residual discretion, particularly where there is no indication that the trial court intended to exercise such discretion. (See *Gomez, supra,* 113 Cal.App.5th at p. 691 ["the trial court cannot invoke its residual discretion to create a

17

lower standard for finding that the facts and circumstances of the [offense] indicate diversion would not protect public safety"].)

On this record, because we cannot conclude that the trial court's decision reflected an appreciation and consideration of its limited residual discretion under section 1001.36, we conditionally reverse the trial court's denial of Smith's mental health diversion application. Therefore, we remand for the trial court to exercise its informed residual discretion to assess whether denial is still appropriate in light of the purposes of the statute and whether diversion would or would not meet those goals. (See *Sarmiento, supra,* 98 Cal.App.5th at p. 893.) We are mindful that the subject mental health determination hearing was held on May 12, 2023. Therefore, in conducting a new hearing under section 1001.36, the trial court shall consider Smith's current eligibility and suitability for mental health diversion, and as necessary, its residual discretion.

### III.   DISPOSITION

The trial court's order denying mental health diversion is reversed, Smith's guilty pleas are conditionally vacated, and the judgment is conditionally reversed. On remand, the trial court shall conduct a new hearing to consider Smith's eligibility and suitability for mental health diversion pursuant to Penal Code section 1001.36 and related considerations consistent with this opinion. If the trial court grants Smith's petition for mental health diversion, Smith's guilty pleas are vacated, and the judgment is reversed. If the trial court again denies mental health diversion, the trial court shall reinstate the judgment of conviction.

18

_____
Wilson, J.

WE CONCUR:



_____
Grover, Acting P. J.




_____
Lie, J.




*People v. Smith*
H052539